NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**CORETTA V. STEVENS, on behalf of D.L.B.,**

                **Plaintiff,**

**-vs-**                                              **Case No. 6:11-cv-1674-Orl-22KRS**

**MICHAEL J. ASTRUE, Commissioner of Social Security,**

                **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the Complaint filed by Coretta V. Stevens on behalf of her son, D.L.B., seeking review of the final decision of the Commissioner of Social Security denying the claim for social security disability benefits for D.L.B. Doc. No. 1. The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA). Doc. No. 12-13. Both parties submitted memoranda of law. Doc. Nos. 16, 20. Accordingly, this matter is ripe for resolution.

### Procedural History.

D.L.B. was born in May 2000. R. 109. In 2008, Stevens applied for disability benefits for D.L.B. under the children's disability provisions of the Supplemental Security for the Aged, Blind and Disabled program (SSI), 42 U.S.C. § 1381, *et seq.* (sometimes

NOT FOR PUBLICATION

referred to herein as the Act). The application alleged that D.L.B. became disabled on December 19, 2008. *Id.* The application was denied initially and upon reconsideration. R. 66, 68-69.

At Stevens's request, an administrative law judge (ALJ) held a hearing on February 16, 2011. Stevens, who was represented by an attorney, testified at the hearing. R. 30-64.

After considering the testimony and the records presented, the ALJ determined that D.L.B. had not engaged in substantial gainful activity since the alleged disability onset date. R. 16. The ALJ found that D.L.B.'s attention deficit hyperactivity disorder (ADHD) was a severe impairment. The ALJ determined that D.L.B.'s impairment did not meet or medically equal the criteria for any of the impairments listed in the applicable social security regulations (the Listings). *Id.*

Because the ALJ concluded that D.L.B.'s impairment did not meet any of the listed impairments, she proceeded to address whether D.L.B.'s impairments were functionally equivalent to the Listings under six domains of functioning, which are as follows: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for yourself; and (vi) health and physical well-being.[1] R. 16-21. The ALJ found that D.L.B. had no limitations in the domains of acquiring and using information, moving about and manipulating objects, and caring for yourself. R. 21, 23, 24.[2] The ALJ found that D.L.B.

---

[1] *See* 20 C.F.R. § 416.926a(b)(1).

[2] In response to the ALJ's questions, counsel for Plaintiff stated that he was not alleging marked or extreme limitations in the domains of acquiring and using information, completing tasks, moving and manipulating objects, and caring for yourself. R. 37-39.

NOT FOR PUBLICATION

had less than marked limitations in the domains of attending and completing tasks and health and physical well-being.  R. 21, 24-25.  The ALJ found that D.L.B. had a marked limitation in the domain of interacting and relating with others.  R. 22.  Because D.L.B. did not have an extreme limitation in any domain or marked limitations in two domains, the ALJ concluded that he was not disabled.  R. 25.

In reaching this decision, the ALJ mentioned that D.L.B. was also diagnosed with oppositional defiant disorder (ODD), but she did not discuss this diagnosis in her analysis.  R. 19. The ALJ discussed Stevens's testimony but did not indicate what weight she gave to that testimony.  R. 17-25.

Stevens requested review of the ALJ's decision by the Appeals Council.  On July 1, 2011, the Appeals Council issued a decision finding no basis for changing the ALJ's decision.  R. 4-6.

Stevens seeks review of the Commissioner's final decision by this Court.

**Jurisdiction and Standard of Review.**

Stevens, on behalf of D.L.B., has exhausted her administrative remedies. Therefore, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).  A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)(per curiam)(internal citations omitted), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

NOT FOR PUBLICATION

## Summary of Facts.

After a thorough review of the record, I find that some of the facts in the record are adequately stated in the ALJ's decision and the parties' memoranda. Accordingly, I will only summarize pertinent portions of the record to protect D.L.B.'s privacy to the extent possible.

In August 2005, Maria E. Masferrer, M.D., performed an outpatient psychiatric evaluation based on reports that D.L.B. was having behavioral problems and difficulty with attention and concentration after he started school. R. 233, 240.[3] At the time of the evaluation, D.L.B. was in kindergarten. R. 236. Upon examination, Dr. Masferrer observed that D.L.B. was cooperative but impulsive. R. 236. His insight, judgment and reliability were poor. His affect was appropriate but his mood was anxious and confused. R. 237. Dr. Masferrer's impression was that D.L.B. suffered from ADHD and ODD, with a global assessment of functioning (GAF) score of 50. R. 238. Thereafter, D.L.B. continued treating with Dr. Masferrer. *See, e.g.,* R. 256-80.

In February 2007, Dr. Masferrer prescribed medication, including Adderall. R. 279. On August 27, 2007, treatment notes reflect that D.L.B. was doing well on medication. R. 252. As of December 2008, Dr. Masferrer assessed D.L.B.'s GAF score as 57. R. 259.

In April 2008, when D.L.B. was in the second grade, he was tested for reading and math skills. He scored in the 17th percentile for total math and in the 22nd percentile for

---

[3] In the section of the form entitled "Drugs," Dr. Masferrer checked "Yes" to tobacco use but wrote, "Mom smoked while pregnant." R. 234. Contrary to the assertion of Plaintiff's counsel, Doc. No. 16 at 6, there is no indication that D.L.B. used tobacco.

total reading.  R. 168.  In the first two grading periods of the 2009 school year, D.L.B. received grades ranging from A to C.  R. 163.

In March 2009, one of D.L.B.'s classroom teachers and his physical education teacher completed a questionnaire rating D.L.B.'s limitations in the six functional areas. They wrote that D.L.B. went to the nurse daily while in school for medication, and he was focused and in tune to his school work after taking medication.  R. 152.  Elsewhere in the form, they wrote, "[D.L.B.] works independently well, after clear instructions.  After awhile, though, he must be brought back on task."  R. 150.

They noted only slight problems in some aspects of acquiring and using information.  R. 147.  They reported an obvious daily problem in refocusing to task when necessary, but the rest of the aspects of the domain of attending and completing tasks were rated slight or no problems.  R. 148.[4]  In the domain of moving about and manipulating objects, they reported a very serious problem with managing the pace of physical activities or tasks and an obvious problem in showing a sense of the body's location and movement in space, with slight to no problems in other aspects of this domain.  R. 150.

In the domain of interacting and relating with others, they rated D.L.B. as having daily to weekly obvious problems in the following areas: playing cooperatively with other children; expressing anger appropriately; asking permission appropriately; and taking turns in a conversation.  When the topic of conversation was not known, they indicated

---

[4] They did not rate D.L.B.'s ability to work at a reasonable pace/finish on time.  R. 148.

that they could understand D.L.B.'s speech no more than one-half the time.  R. 150.  They wrote, "When [D.L.B.] is on his meds he behaves in class. Suspended once this term [for] running from principal," and "No extra help is needed at this time."  R. 149.

In the domain of caring for yourself, they indicated obvious daily or weekly problems in the following: handling frustration appropriately and being patient when necessary, with slight to no problems in other aspects of this domain.  R. 151.

A psychologist who reviewed D.L.B.'s records opined on May 2, 2009, that D.L.B. had no limitations in the domains of acquiring and using information and caring for yourself, and less than marked limitations in the domains of attending and completing tasks and interacting with others, but he rendered no opinion on the other domains.  R. 281-86.  He summarized the basis for his conclusion as follows:

> 8 y/o in 2nd grade Reg Ed functioning on grade level with A/B grades and S in electives.  He is dx ADHD and ODD and has hx of aggressive behavior and defiance.  He has been treated with Risperdal and Dexedrine with positive results.  Teacher indicates that he works well independently when directions are clear but does need reminders to stay on task after a while.  He generally relates adequately to peers and follows rules with occasional lapses in behavior.  With meds he is focused and in tune with his school work.  Self care c/w age.  Impairment does not m/e listing.

R. 286.

In June 2009, D.L.B. began treatment for ODD with "Our" Children First. R. 289.  The initial report indicates that D.L.B. was having difficulty controlling his anger, he was disruptive in school, and he became upset at school after forgetting to take his medicine.  He was suspended from a summer program after hitting another child and then leaving

the school grounds. R. 296.[5] The initial assessment was that D.L.B. had ODD and ADHD with a GAF score of 50 to 52. R. 313.[6]

In October 2009, another of D.L.B.'s teachers prepared a questionnaire rating his limitation in the six functional areas. She indicated that D.L.B. was working at his actual grade level. R. 192. She wrote, "[D.L.B.] is 100% on it when he's on his meds. I believe that if the parent made sure he took it he would be fine." R. 198. This teacher found no problems in the domains of acquiring and using information, moving about and manipulating objects, and caring for yourself. R. 193, 196, 197. In the domain of attending and completing tasks, she found obvious problems in paying attention when spoken to directly and slight to no problems in other areas. She wrote that D.L.B. had no problems in any of the areas of this domain when taking his medication. R. 194. In the domain of interacting and relating with others, she found that D.L.B. had a serious problem in expressing anger appropriately with slight to no problems in other areas. Once again, she wrote that when D.L.B. took his medication as prescribed, he had no problems in this domain. R. 195.

---

[5] Other notes in the "Our" Children First records indicate that D.L.B. witnessed domestic violence between his father and his father's girlfriend. R. 310, 316. These notes also reflect that in March 2009, D.L.B. was involuntarily hospitalized under the Baker Act due to being violent with a police officer after D.L.B. stole a bicycle. R. 318. The notes further state that, on July 20, 2009, D.L.B. was taken to "Halifax Behavioral Services for a Baker Act Screening but was let go." R. 305, 312. Records of these hospital visits do not appear to be in the record before the Court.

[6] In response to a question whether D.L.B. had been abused or neglected, the Case Management Needs Assessment form reads as follows: "Client was in the care of his father when he was dealing substances per his mother." R. 303. Plaintiff's counsel reads this to mean that D.L.B. was dealing substances, while the Commissioner reads the form to mean that D.L.B. was in his father's custody while his father was dealing substances. *See* Doc. No. 16 at 8. There is no indication in the record supporting the interpretation that D.L.B. was dealing controlled substances.

NOT FOR PUBLICATION

On October 5, 2009, D.L.B. was suspended from school for fighting in the cafeteria with another student. R. 331.

On November 10, 2009, a psychologist prepared a functional capacity report after review of D.L.B.'s records. She found no limitation in the domains of acquiring and using information, moving about and manipulating objects, and caring for yourself. She found less than marked limitations in the domains of attending and completing tasks and interacting and relating with others. She did not rate the domain of health and physical well being. R. 320-25. In support of these findings, the psychologist wrote, "No [m]arked impairments; medication compliance appears to be an issue. When taking as prescribed, clmt appears to function well." R. 325.

From about September 2009 through May 2010, D.L.B. participated in counseling with Jeff Meyers. R. 292, 360; *see also* R. 42, 44.

As of March 2010, Stevens reported to "Our" Children First that D.L.B. was making moderate progress with following directions and reducing his impulsivity. R. 328.

On May 4, 2010, D.L.B. was discharged from "Our" Children First. The discharge summary reflects that D.L.B. met all five objectives of the program. Specifically, D.L.B. "has demonstrated effective self regulating skills to deal with his impulsivity and is motivated to comply with adult directions upon the first prompt." R. 327. However, a subsequent record reflects that D.L.B. started a fire in August 2010. R. 359.

On September 15, 2010, Beth Gage, L.C.S.W., performed a psychosocial assessment of D.L.B. Gage observed that D.L.B. sat calmly through the interview. His

affect was neutral and his mood was blunted. Gage's assessment was ADHD, ODD, and mood disorder, not otherwise specified with a GAF score of 50. R. 364.

On September 16, 2010, D.L.B. received an in-school suspension when he was play fighting with another student, and it got out of hand. On October 5, 2010, he was placed in time out for getting angry and leaving the classroom without permission. The next day, October 6, 2010, he received time out and suspension of privileges because he hit a student who called him an inappropriate name. R. 224.

A treatment note from Halifax Behavioral Services dated September 27, 2010 reflects that D.L.B. had difficulty controlling impulses at times. R. 342. His GAF score was 45. R. 347. Later treatment notes, dated October 26, 2010 and January 27, 2011, indicate that D.L.B. was "doing better." R. 340-41.

On February 2, 2011, D.L.B. received a time out at school because he would not follow directions from his teacher. R. 224. On February 3, 2011, he had a teacher conference after he talked after being told not to do so and for throwing paper. R. 224-25.

The principal of D.L.B.'s elementary school wrote to Stevens on February 15, 2011 as follows:

> [D.L.B.] has demonstrated better behavior during the first part of the current school year than in the past. In fact, he had only three discipline referrals for the entire first semester, and those occurred in PE and art classes. In Mrs. Brannan's 4th grade classroom he received none.
>
> Recently, [D.L.B.] has begun misbehaving again. In fact, he received two discipline referrals from Mrs. Brannan in February for classroom disruptions. Previously, [D.L.B.] had

NOT FOR PUBLICATION

> no referrals from his classroom teacher and certainly did not
> challenge her on teacher requests. I do not want to see him
> return to his former misbehavior as experienced in prior
> school years.

R. 222.

Stevens testified and told various treatment providers about D.L.B.'s history. She indicated that when D.L.B. was in Head Start, he was found with 20 $1.00 bills and a lighter. R. 49. The last day of Head Start, he kicked the teacher. *Id.* She reported that D.L.B. was held back in second grade because he was constantly in trouble and being suspended. While he was promoted in subsequent years, Stevens indicated that the school was considering expelling him in 2010. R. 37. One of D.L.B.'s teachers called Stevens when D.L.B. had behavioral problems rather than always writing a disciplinary report. R. 47.

Stevens testified that, in 2010, D.L.B. was getting suspended, the police were being called, and she had to go to school three or four times a week to deal with D.L.B.'s conduct. R. 45. He was also kicked out of the after school program and a daycare program. R. 61.

In 2011, D.L.B. was on the drill team at school and got to march in the Christmas parades. He was kicked off that team after trying to fight with the drill team teacher. R. 54. Stevens testified that D.L.B.'s first suspension in 2011 occurred the week before the ALJ's hearing. R. 41.

At home, Stevens had to remind D.L.B. to do household chores. R. 56. He was able to dress himself. R. 58. D.L.B. played with his siblings and neighborhood children from time to time. R. 55.

Stevens testified that D.L.B.'s medication caused him to go to sleep and move "like a snail," and his teacher in 2011 indicated that he was "just drooping." R. 39-40, 58.

**Analysis.**

Stevens asserts that the ALJ erred by failing to consider the diagnosis of ODD in the analysis, by failing to state the weight given to Stevens's testimony, by failing to discuss the effect of side effects of medication and D.L.B.'s occasional failure to take medication as prescribed in the domain of caring for yourself, and by failing to evaluate each functional domain properly. In addition, Stevens argues that the ALJ made a number of mistakes in the factual findings. All of these assignments of error are interrelated.

While the ALJ recited Stevens's testimony fairly accurately, she then made factual findings that were inconsistent with Stevens's testimony. For example, the ALJ found that "[t]he schools have not expelled or suspended the claimant." R. 22. The school records reflect that D.L.B. was suspended. Stevens testified that D.L.B. had repeated suspensions in addition to those in the school records and that the school considered expelling him in 2011. The ALJ did not explain why she did not credit Stevens's testimony regarding D.L.B.'s school suspensions.

The ALJ also found that "the claimant has turned himself around with the help of Our Child First." R. 19. However, Stevens reported that after D.L.B. was discharged

from "Our" Children First, he continued to have serious problems including being discharged from an after-school program and a drill team and starting a fire.  Once again, the ALJ did not explain why she did not credit Stevens's testimony about D.L.B.'s problems after being discharged from "Our" Children First.[7]

The Eleventh Circuit requires an ALJ to articulate credibility findings for witnesses if credibility is crucial to the decision.  *See, e.g., Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir. 1983); *see also Preston ex re. K.B. v. Astrue*, Case No. 3:06-cv-1080-J-TEM, 2008 WL 876349, at * 6 (M.D. Fla. March 27, 2009) (internal citations omitted).  Because Stevens's testimony, if credited, undermines several of the ALJ's factual findings, the failure to state the weight given to Stevens's testimony presents an insufficient record for the Court to be able to make a reasoned decision whether the ALJ's decision is supported by substantial evidence and based on correct application of the law. *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (internal citations omitted).

For these reasons, the Commissioner's decision must be reversed.  Stevens asks that the Court remand the case for an award of benefits.  Remand for an award of benefits is warranted only when the Commissioner has considered the essential evidence, and it is clear without doubt that the claimant is disabled.  *See Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993) (citing *Bowen v. Heckler*, 748 F.2d 629, 635-36 (11th Cir. 1984)).

---

[7] The ALJ also found that D.L.B.'s attorney at the administrative level stipulated that D.L.B. had no limitations in the domains of acquiring and using information, moving about and manipulating objects, and caring for yourself.  R. 21, 23, 24.  Careful review of the hearing transcript reveals, however, that D.L.B.'s attorney stipulated only that D.L.B. did not have marked or extreme limitations in these domains.  R. 38-39.  While ultimately not dispositive of the question of disability, it illustrates another inconsistency between the ALJ's factual findings and the record.

Because the Commissioner has not yet properly considered Stevens's testimony, it is not clear that D.L.B. is disabled without doubt.

On remand, the Commissioner should ensure that all of the evidence of record is considered and discussed as required by *Winschel*. This includes evidence of ODD, side effects of and non-compliance with medication, school test scores, and any updated records presented by Stevens.

### RECOMMENDATION.

Based on the foregoing reasons, it is **RESPECTFULLY RECOMMENDED** that the decision of the Commissioner be **REVERSED** and the case be **REMANDED** for further proceedings. I further **RECOMMEND** that the Court direct the Clerk of Court to issue a judgment consistent with its Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida this 9th day of January 2013.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE